**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 22-2512 & 23-1316
_____

UNITED STATES OF AMERICA

v.

JEREMY EDWARD JOHNSON,
                                      Appellant in No. 22-2512


UNITED STATES OF AMERICA

v.

SUSAN MELISSA NICKAS,
                                      Appellant in No. 23-1316


_____


On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal Nos. 3:21-cr-00143-001 and 3:21-cr-00143-002)
District Judge: Honorable Malachy E. Mannion
_____


Submitted Under Third Circuit L.A.R. 34.1(a)
on May 15, 2025

Before: SHWARTZ, MATEY, and FREEMAN, *Circuit Judges*

(Opinion filed: September 30, 2025)

_____

OPINION[*]
_____

FREEMAN, *Circuit Judge*.

A jury convicted Jeremy Johnson and Susan Nickas of drug offenses that resulted in the death of Joshua Kiernan. We will affirm both judgments of conviction.

**I**

On December 11, 2020, Joshua Kiernan died of an overdose on a combination of heroin and fentanyl. At the scene of the overdose, law enforcement recovered a syringe and two loose empty plastic bags that they suspected had contained drugs. One of the loose bags bore a "Rite-Aid" stamp, and the other was unstamped. Law enforcement also found Kiernan's drug kit, which contained banded bundles of small bags containing suspected drugs (some bearing the Rite-Aid stamp and others that were unstamped), and several empty bags (some stamped Rite-Aid and some unstamped).

A forensic scientist tested the substance in one of the full bags bearing the Rite-Aid stamp and the substance in one of the full unstamped bags. Both contained heroin and fentanyl. The scientist also tested the residue in one of the stamped empty bags and one of the unstamped empty bags. Both tested positive for heroin and fentanyl.

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Law enforcement obtained evidence connecting both the stamped and unstamped bags of drugs to Johnson and Nickas.[1]  Over the year immediately preceding Kiernan's death, Johnson and Nickas obtained drugs from New Jersey, and Johnson routinely distributed the drugs to people in Pennsylvania.  Kiernan and Kiernan's fiancée, Kaleigh Watson, were two of Johnson's customers.

Hundreds of Nickas's and Johnson's text messages and Facebook messages documented their drug transactions.  As particularly relevant here, messages showed that Johnson bought $300 worth of drugs from Nickas on December 6, 2020.  Johnson contacted Nickas to obtain more drugs on December 7, 8, and 9, but Nickas had no drugs available.  On December 9, Johnson and Nickas agreed that the two of them would get more drugs the following day.

On the morning of December 10, 2020, Watson sought drugs for herself and Kiernan.  The couple had been unable to acquire drugs on December 9, and their supply was running low.  Watson sent Johnson a message asking if he had obtained more drugs from Nickas, and Johnson responded that he and Nickas were planning to go to New Jersey at 1:00 p.m. that afternoon to buy drugs, Watson and Kiernan needed drugs sooner, though, so Watson asked Johnson if he had any drugs available "right now," and Johnson responded, "I might.  Yea for now."  Nickas App. 1103.  Watson then asked Johnson to meet her that morning to supply her some drugs, and she offered to drive Johnson to Nickas's home afterward.  Watson also suggested that Johnson could acquire

---

[1] All references to "drugs" refer to a mixture of heroin and fentanyl.

drugs from someone named Jeff "beforehand." Nickas App. 1104. That exchange of messages ended at 9:41 a.m.

Later that morning, Johnson made various phone calls to various other drug contacts, and cell site location data show that Johnson's cell phone travelled to locations outside of Johnson's residence.

Around 11:00 a.m. that day, Johnson met Watson and sold her two bundles of drugs in unstamped bags. Watson delivered some of those drugs to Kiernan at his work site later that day. Watson also gave Johnson additional money that he could use to buy drugs for her and Kiernan during his planned drug run to New Jersey with Nickas that afternoon.

On the evening of December 10, Kiernan used drugs in his home bathroom and passed out from the effects. Watson performed mouth-to-mouth resuscitation on him. Later that evening, Kiernan went out to meet Johnson to pick up the drugs Watson had prepaid for. Kiernan brought those drugs home, he and Watson divided them up, and the couple used some of them that night. Those drugs were in bags bearing a Rite-Aid stamp.

On the morning of December 11, 2020, Kiernan left for work, where he overdosed, leading to his death. Kiernan often used more than one bag of drugs at a time when Watson was not watching.

In February 2021, police arrested and interrogated Johnson. About twenty-five minutes into the interrogation, Johnson said, "I want a lawyer." Johnson App., Ex. A at

4

25:08. Although no lawyer was provided to him, discussions continued for a few more minutes, and Johnson then said he would continue the interrogation without an attorney.

In May 2021, a grand jury returned an indictment charging Johnson and Nickas with two counts: (1) conspiracy to distribute heroin and fentanyl, resulting in death of a user, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C); and (2) distributing heroin and fentanyl, resulting in death of user, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). Before trial, Johnson moved to suppress all statements he made after requesting an attorney during his interrogation. The District Court denied the motion, concluding that Johnson voluntarily waived his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).

A jury convicted Johnson and Nickas of both counts. The District Court sentenced Johnson to 300 months' imprisonment and Nickas to 240 months' imprisonment. Each defendant timely appealed.

**II**[2]

On appeal, Johnson raises his *Miranda* claim, and Nickas raises five claims, two of which Johnson joins and adopts.[3] We address each claim in turn.

---

[2] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

[3] Nickas stated her intent to join and adopt certain arguments in Johnson's brief, but none of those arguments appear in Johnson's brief.

A

Johnson argues that the statements he made to police after he requested an attorney were obtained in violation of *Miranda*. The District Court declined to suppress those statements, finding no *Miranda* violation.[4] We need not decide whether there was a *Miranda* violation because, even assuming there was, the violation was harmless.

When statements obtained in violation of *Miranda* are admitted at trial, we will reverse the judgment of conviction unless the government proves beyond a reasonable doubt that the statements were harmless—i.e., that the statements did not contribute to the conviction. *United States v. Brownlee*, 454 F.3d 131, 148 (3d Cir. 2006). Here, the government has met its burden of proving harmlessness.

Because the District Court denied Johnson's motion to suppress, we view the facts in the light most favorable to the government. *United States v. Kramer*, 75 F.4th 339, 342 (3d Cir. 2023). Apart from Johnson's challenged statements, the government's evidence tracked the drugs Kiernan obtained on the day before his death. Electronic messages and witness testimony detailed how some of those drugs went from Johnson to Watson to Kiernan on the morning of December 10, 2020, and others went directly from Johnson to Kiernan that night. In light of the record as a whole, we are convinced that any additional inculpatory evidence from Johnson's post-25-minute-mark statements did not contribute to the jury's verdict. *See United States v. Shabazz*, 564 F.3d 280, 286 (3d

---

[4] We review the District Court's factual findings for clear error, and we give its legal conclusions plenary review. *United States v. Jackson*, 120 F.4th 1210, 1217 (3d Cir. 2024).

Cir. 2009) (deeming any error from the denial of the suppression motion harmless because due to the other overwhelming evidence of guilt).

B

Nickas argues that there is insufficient evidence to sustain her convictions. Her argument stems from the two bags of drugs that were found at the scene of the overdose: the unstamped bag and the bag with the Rite-Aid stamp. Nickas concedes that the evidence supports that she was the source of the drugs in the bag with the Rite-Aid stamp, but she contends that no evidence connects her to the drugs in the unstamped bag. She also contends that the government did not prove the drugs in the bag bearing the Rite-Aid stamp caused Kiernan's death.

Nickas emphasizes that, after Johnson bought drugs from her on December 6, he did not buy additional drugs from her until December 10. She also points to the other drug contacts Johnson messaged and called before he delivered unstamped bags of drugs to Watson on the morning of December 10. Based on this evidence, Nickas reasons that Johnson had no remaining drugs from Nickas's supply on the morning of December 10, so Johnson must have sold Watson drugs from another supplier that morning.

Our review of this sufficiency claim is "highly deferential to the jury's verdict." *United States v. Jacobs*, 21 F.4th 106, 112 (3d Cir. 2021).[5] We review the record "in the light most favorable to the prosecution and ask only whether *any* 'reasonable juror could

---

[5] "We exercise plenary review over a district court's grant or denial of a motion for judgment of acquittal based on the sufficiency of the evidence." *United States v. Zayas*, 32 F.4th 211, 216 (3d Cir. 2022).

accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt.'" *Id.* (quoting *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430–31 (3d Cir. 2013) (en banc)). We will "uphold the verdict as long as it does not 'fall below the threshold of bare rationality.'" *Id.* (quoting *Caraballo-Rodriguez*, 726 F.3d at 431).

Viewing the evidence in the light most favorable to the prosecution: Johnson obtained $300 worth of drugs from Nickas on December 6, 2020,[6] and he still had some of those drugs on the morning of December 10, 2020, when he told Watson that he had drugs available for her to purchase. Nickas App. 1103 (responding "Yea for now" to Watson's question about whether he had drugs "right now," and doing so before he communicated with other drug contacts that day). That morning, Johnson provided drugs from that supply to Watson in unstamped bags. Watson gave some of those unstamped bags of drugs to Kiernan later that day. The next day, Kiernan died of an overdose, and two empty bags of drugs were found at the scene—one stamped and one unstamped. Those empty bags are the ones that caused Kiernan's overdose death. The unstamped bag came from the supply Johnson obtained from Nickas on December 6, and the stamped bag came from Nickas on December 10.

Nickas argues that Johnson must have run out of the drugs she sold him on December 6 before December 10, as he was looking to buy more in the intervening days.

---

[6] Nickas argues that the deal was for $200 of drugs, but the text messages indicate that Johnson was buying drugs for "200 plus the 100 [he] owe[d Nickas]." Nickas App. 457.

But Johnson's desire to buy more drugs does not establish as a factual matter that he had run out of the drugs he bought from Nickas. A reasonable jury could find that he had not. And we cannot reverse this jury's verdict "simply because another inference is possible—or even equally plausible." *Jacobs*, 21 F.4th at 113 (quoting *Caraballo-Rodriguez*, 726 F.3d at 432). Sufficient evidence supports the jury's verdict against Nickas.[7]

## C

Nickas and Johnson argue that the District Court was required to instruct the jury that the "death results" element of the charged offenses requires proximate causation and a knowing or intentional *mens rea*. We review this unpreserved argument for plain error, *Jacobs*, 21 F.4th at 114, and we discern none.

As Nickas and Johnson acknowledge, their proximate-causation argument is foreclosed by longstanding precedent. *Id.* at 113–15 (continuing to follow *United States v. Robinson*, 167 F.3d 824 (3d Cir. 1999)). And the lack of a *mens rea* instruction was not plain error.

We have previously declined to read a *mens rea* requirement into the "death results" element of 21 U.S.C. § 841 offenses. *Id.* at 114 (explaining that the "death results" element "puts drug dealers on clear notice that their sentences will be enhanced if people die from using the drugs they distribute[,] . . . regardless of whether th[e] defendant could have reasonably foreseen that death would result" (cleaned up)).

---

[7] Nickas also raises an unpreserved argument that she could not have distributed drugs to Johnson or conspired to do so—instead, Johnson engaged with Watson and Kiernan in joint possession of drugs for personal use. We review this claim for plain error, *Jacobs*, 21 F.4th at 112, though it warrants no discussion, as it is clearly belied by the record.

Moreover, contrary to Nickas's and Johnson's contention, it is far from plain that *Ruan v. United States*, 597 U.S. 450 (2022) disturbs that precedent. In *Ruan*, the Supreme Court held that a 21 U.S.C. § 841(a)(1) conviction requires the government to prove that the defendant knowingly or intentionally acted in an unauthorized manner. 597 U.S. at 457. The Court reasoned that "a lack of authorization is often what separates wrongfulness from innocence." *Id.* at 458, 461. But the *Ruan* opinion did not address the "death results" element, which enhances the sentence for certain § 841(a)(1) convictions but plays no role in separating wrongful from innocent conduct. *See Burrage v. United States*, 571 U.S. 204, 210 & n.3 (2014). Thus, the District Court did not plainly err in following our current precedent. *See Jacobs*, 21 F.4th at 115.

D

Nickas and Johnson argue that the prosecution improperly vouched for Watson's credibility at trial through the testimony of one of its witnesses: Detective Kimberly Lippincott. They take issue with Lippincott's testimony that Watson initially lied to investigators, denying that she helped obtain the drugs that killed Kiernan, but later told the investigators the truth in an April 2021 interview. Nickas and Johnson argue that Watson's April 2021 statement to investigators was consistent with her trial testimony, so Lippincott's testimony bolstered the latter.

10

The District Court overruled Nickas's objection to the purported vouching. That ruling was not an abuse of discretion.[8] *See United States v. Vitillo*, 490 F.3d 314, 325 (3d Cir. 2007).

Improper vouching occurs when the prosecutor (1) provides assurance of a witness's credibility (2) "based on either the prosecutor's personal knowledge, or other information not contained in the record." *United States v. Weatherly*, 525 F.3d 265, 271 (3d Cir. 2008) (cleaned up). "Although vouching most often occurs during summation, it may occur . . . during . . . witness examination, when the elicited testimony satisfies the two criteria for vouching." *United States v. Berrios*, 676 F.3d 118, 134 (3d Cir. 2012) (citation omitted), *abrogated on other grounds, Lora v. United States*, 599 U.S. 453 (2023); *see also Vitillo*, 490 F.3d at 327–28, *as amended* (Aug. 10, 2007).

The criteria for vouching are not satisfied here. Nickas and Johnson do not argue (and nothing in the record supports) that Lippincott testified based on *the prosecutor's* personal knowledge. And although Nickas and Johnson argue that Lippincott's opinions of Watson's veracity when speaking to investigators was based on extra-record information Lippincott gleaned during the investigation, it is far from clear that the basis of Lippincott's opinions was not contained in the record. After all, Lippincott gave lengthy testimony about the information she obtained during the investigation, beginning with the very first phone call she received about Kiernan's death. Moreover, Watson

---

[8] The government contends that Nickas did not object based on vouching. We need not decide whether Nickas preserved this issue because, assuming she did, the District Court's ruling withstands abuse-of-discretion review.

11

herself had already testified that she lied in initial interviews but later told the truth when the detectives showed her messages and she "realized [she] couldn't hide anything anymore." Nickas App. 273.

In any event, when we address a claim of improper vouching, "the statements must be considered in context." *Weatherly*, 525 F.3d at 272. Here, many of Lippincott's challenged answers were reasonable responses to questions from Nickas's defense counsel. For instance, Nickas and Johnson challenge Lippincott's testimony that "when someone is lying to me over and over and over again, sometimes when we lay all our cards out there, that gets them to tell the truth." Nickas App. 325. But that answer was a direct response to a question from Nickas's counsel: "What is your practice with respect to interviewing witnesses in terms of showing all your cards during an interview?" *Id.* Thus, context demonstrates that Lippincott reasonably responded to questions from defense counsel and did not improperly vouch for Watson.

E

Nickas asserts that she suffered prejudice due to prosecutorial misconduct. In support, she points to eight different remarks the prosecutor made during summation. Nickas did not object to any of these remarks at trial, so we review her claim for plain error. *United States v. Fulton*, 837 F.3d 281, 306–07 (3d Cir. 2016).

Nickas could not obtain relief on this claim even if it were preserved and even if we concluded that the prosecutor's remarks constituted misconduct. That is because the purported misconduct did not "so infect[] the trial with unfairness as to make the

12

resulting conviction a denial of due process." *United States v. Repak*, 852 F.3d 230, 259 (3d Cir. 2017) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

We address the challenged remarks individually before conducting our cumulative analysis of "the prosecutor's offensive actions in context and in light of the entire trial." *Id.* (citation omitted).

First, Nickas argues that the prosecutor began her summation by poisoning the proverbial well, remarking that Johnson and Nickas, like "all criminal defendants," urge jurors to be distracted by irrelevant issues rather than focusing on credible evidence of guilt. Nickas App. 492. Nickas contends that this remark attacked her right to present a defense. But we have held that "attacks on the opposing advocate's arguments and tactics are acceptable, and indeed that attacking and exposing flaws in one's opponent's arguments is a major purpose of closing argument." *United States v. Rivas*, 493 F.3d 131, 139 (3d Cir. 2007). In any event, the remark does not warrant reversal because the District Court instructed the jury that it was to rely on evidence, not counsel's statements, in reaching a verdict, and there was ample evidence to convict Nickas. *See Repak*, 852 F.3d at 258–60.

Second, Nickas asserts that the prosecutor attacked her character when she suggested, without record support, that Nickas referred to Kiernan and other individuals who purchased her drugs as "dumb ass junkies" and that Nickas might call one of the trial witnesses a "scum bag junkie." Nickas App. 493. The trial evidence did not show that Nickas used that language to describe Kiernan, but it did show that Nickas regularly called her customers (including one of the trial witnesses) "junkie[s]," "scum bag

13

junkies," and "junkie assholes." Nickas App. 341, 454, 455. Thus, in context, the prosecutor's remarks did not infect the trial with unfairness.

Third, Nickas claims the prosecutor misled the jury and misstated the law by saying that it was a "non-issue" that police tested some but not all of the bags of drugs found at the scene of Kiernan's overdose. Nickas App. 496. But Nickas mischaracterizes the prosecutor's remark. In response to defense counsel's suggestion that the random sampling performed on the bags was insufficient, the prosecutor argued to the jury that it could infer from the random sampling that all bags of drugs at the scene contained heroin and fentanyl. That argument neither misled the jury nor misstated the law.

Fourth, Nickas challenges the prosecutor's remark that the prosecution did not have to prove which bag of drugs caused Kiernan's death. But the prosecutor was simply repeating her argument that the evidence showed both the unstamped and the stamped bags came from Johnson and Nickas, so it did not matter which caused Kiernan's death.

Fifth, Nickas contends that the prosecutor misled the jury when she said the scene of Kiernan's death was not disturbed by Kiernan's coworkers. Nickas contends that a law enforcement witness testified otherwise. But the law enforcement witness merely confirmed that Kiernan's coworkers reported having moved Kiernan's body so they could render aid; the witness did not characterize that as disturbing the scene of Kiernan's death. Thus, there is no conflict between the prosecutor's remark and the witness's testimony, so the remark was not misconduct. *See United States v. Lee*, 612 F.3d 170, 194 (3d Cir. 2010) (holding that a "prosecutor is entitled to considerable latitude in

14

summation to argue the evidence and any reasonable inferences that can be drawn from that evidence" (citation omitted)).

Sixth, Nickas argues that the prosecutor overestimated how many bags of drugs Johnson purchased from Nickas on December 6, 2020, to make it sound like Johnson would have more drugs available to supply to Watson on December 10, 2020. Specifically, Nickas points to the prosecutor's remark that Johnson gave Nickas enough money to purchase "five bundles, 250 bags." Nickas App. 498. As the government concedes, that statement was incorrect. Indeed, the trial evidence made clear that a bundle of drugs contains 10 bags, so five bundles would contain 50 bags (not 250). But the prosecutor did not repeat her incorrect statement, and, where the jury was instructed that the prosecutor's arguments are not evidence, the misstatement did not infect the trial with unfairness. *See Repak*, 852 F.3d at 259.

Seventh, Nickas asserts that the prosecutor improperly shifted the burden of proof to the defense when she remarked that no evidence—only speculation—supported that Johnson purchased drugs from individuals other than Nickas in the days before Kiernan's death. But "[t]he prosecutor's comment attempted to focus the jury's attention on holes in the defense's theory," which does not support relief on plain error review. *United States v. Balter*, 91 F.3d 427, 441 (3d Cir. 1996).

Lastly, Nickas takes issue with a comment about the theory that Johnson had drug suppliers other than Nickas. The prosecutor stated, "I think it's a fair guess in light of the history of Jeremy Johnson and Susan Nickas working together for a year to get and sell drugs, they didn't have independent sources . . . . They were a team." Nickas App. 498.

15

Of course, a jury may not "guess" at whether the government proved a defendant's guilt beyond a reasonable doubt. And on rebuttal, co-counsel for the government clarified that the "fair guess" remark was "a misspeak," and told the jury that "nobody is asking [it] to guess at anything." Nickas App. 510–11. The government then reiterated that the jury had to find Nickas guilty beyond a reasonable doubt based on the evidence, and the District Court also provided that clear instruction. In light of the government's correction and the clear jury instruction, we are satisfied that the improper remark did not "so taint[] the trial as to violate [Nickas's] Fifth Amendment rights." *Repak*, 852 F.3d at 259.

Nickas takes issue with the prosecutor's remarks that either were not misconduct at all or did not infect her trial with unfairness. Considering these prosecutorial statements individually and cumulatively, we are assured that they did not infect the trial with unfairness.

E

In her final claim, Nickas seeks a new trial due to the cumulative prejudice from the errors in her trial. We review this unpreserved claim for plain error, *United States v. Greenspan*, 923 F.3d 138, 154 (3d Cir. 2019), but the result would be the same under any standard of review: Because any errors at Nickas's trial were harmless, there is no prejudice to cumulate. *See Balter*, 91 F.3d at 442–43.

*     *     *

For the foregoing reasons, we will affirm both judgments.